**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| **BATTLE BORN MUNITIONS INC.,** | ) | |
| 171 Coney Island Drive | ) | |
| Sparks, Nevada 89431 | ) | |
| | ) | Civil Action No.  1:16-cv-00736 |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| **MANHATTAN COMPANY** | ) | |
| **FOR COMMERCIAL AGENCIES,** | ) | |
| Yassin Kilani & Partners Building | ) | |
| Sulaym Bin Al-Hareth Street | ) | |
| Amman, Jordan, 11118 | ) | |
| | ) | |
| | ) | |
| **MOHAMMED Y. KILANI,** | ) | |
| Yassin Kilani & Partners Building | ) | |
| Sulaym Bin Al-Hareth Street | ) | |
| Amman, Jordan, 11118 | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

**COMPLAINT**

COMES NOW Battle Born Munitions, Inc. ("BBM"), by and through undersigned

counsel, alleging as follows:

**INTRODUCTION**

1.      This is an action arising from breach of contract, fraud, and unjust enrichment

perpetrated by Manhattan Company for Commercial Agencies ("Manhattan") and its corporate

officer at the expense of BBM.  In 2014, the Ministry of Defense for the Republic of Iraq

("Iraq") contracted with Manhattan to arrange for the procurement of sixteen Bell 407 GX

helicopters, related equipment, and logistical support.  To fulfill this request, Manhattan's owner

and President, Mohammed Y. Kilani ("Kilani"), traveled to Washington, DC, to meet with BBM

in August 2014.  During this meeting in Washington and thereafter, Kilani repeatedly represented to BBM that he was a trustworthy and reputable businessman who would make timely payments for delivery of the helicopters to Iraq.  Specifically, Kilani assured representatives of BBM that BBM did not require a formal letter of credit with Manhattan to ensure payment for the helicopters because it could rely on a separate letter of credit Manhattan had negotiated with Iraq to guarantee payment.  He further represented that another letter of credit with BBM would add unnecessary costs and time delays to the project.

2.      As a direct result of these fraudulent representations by Manhattan and its corporate officer, BBM entered into a contract with Manhattan in August 2014 to arrange for the procurement and delivery of sixteen new Bell 407 GX helicopters, three sets of spare parts, 120 flight suits, 120 flight helmets, and 30 radio systems.  Pursuant to the contract, BBM fully performed and delivered sixteen airworthy helicopters and related equipment to Iraq in early 2015.  Despite the fact that BBM fully performed its obligations under the August 2014 purchase contract, Manhattan breached the contract by refusing to pay $8,389,000 owed to BBM.  Moreover, BBM believes that Manhattan has willfully failed to pay monies clearly owed to BBM despite Manhattan having drawn down funds on its letter of credit with Iraq, funds used in violation of the terms of that letter of credit and most of which are rightfully due to BBM for delivery of the helicopters.  After failing to provide the final payment, Manhattan and Kilani have ceased all communication with BBM, leaving it with no recourse.

## PARTIES

3.      Battle Born Munitions, Inc., is a corporation organized and existing under the laws of the State of Nevada with its principal place of business at 171 Coney Island Drive, Sparks, Nevada, 89431.

4.      Manhattan Company for Commercial Agencies is a company formed in the Hashemite Kingdom of Jordan ("Jordan") with its principal place of business in the Mohammed Yassin Kilani & Partners Building, Sulaym Bin Al-Hareth Street, Amman, Jordan, 11118.

5.      Mohammed Y. Kilani is a Jordanian citizen and resident of Amman, Jordan, who has at all times relevant to this lawsuit been the President of Manhattan.  On information and belief, Kilani maintained U.S. Permanent Resident Status (a "Green Card") until at least early 2015.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interests and costs.

7.      Personal jurisdiction and venue are proper because substantial parts of the events or omissions giving rise to the claims stated herein occurred in the District of Columbia:

   a.   Manhattan contracted directly with BBM, a U.S. company with its headquarters in Nevada, to procure U.S. sourced helicopters for export to Iraq. Kilani and other Manhattan representatives engaged in consistent oral and written communications with BBM in executing the contract for export of U.S. goods and services.

   b.   For three days in August 2014, Manhattan and Kilani traveled to Washington, DC, to meet with BBM, Bell Helicopter, and Denel SOC Ltd., to negotiate the purchase contract at issue in this lawsuit.

   c.   During the meeting in Washington, DC, Manhattan and Kilani fraudulently represented that BBM could rely on Manhattan's letter of credit with Iraq to guarantee payment for the helicopters and related equipment.

   d.   BBM and Manhattan formally executed a purchase contract in Washington, DC, on August 4, 2014.  This is the contract that BBM alleges Manhattan ultimately breached.

e.  Manhattan's Business Development Manager traveled to Piney Flats, Tennessee, and Fort Worth, Texas, to inspect the 16 helicopters and spare parts lots before they were shipped to Iraq's Ministry of Defense.

f.  Manhattan avails itself of correspondent bank accounts in the United States, including an account with Bank of America in New York.

g.  On at least four occasions in 2015, Manhattan wired money through correspondent bank accounts in New York to BBM's bank accounts in Texas and Nevada.

h.  Corporate officers of Manhattan, including Kilani, traveled to Washington, DC, in order to attend the October 2015 Meeting of the Association of the United States Army ("AUSA").  They fraudulently attempted to use Manhattan's status as an agent of BBM to enter the AUSA Meeting.

i.  Manhattan has done in excess of $50 million of business deals with Cavalcade Services, LLC ("Cavalcade") – a company that is owned by a United States citizen and has its principal place of business in Texas.  In the instant dispute, Cavalcade helped negotiate the underlying deal between BBM and Manhattan.

j.  In the alternative, if the court does not believe sufficient facts have been pled as to jurisdiction, BBM respectfully requests jurisdictional discovery to uncover Manhattan and Kilani's additional connections to the United States.

## FACTUAL BACKGROUND

8.    BBM was formed for the purpose of importing and distributing technology and equipment for the defense and aerospace industry.

9.    On information and belief, Manhattan was formed by Mohammed Y. Kilani ("Kilani") as a Commercial Agent in Jordan.

**A.    Iraq contracted with Manhattan to arrange the procurement of sixteen Bell 407 GX helicopters.**

10.    In 2014, Iraq's Ministry of Defense announced a request to procure Bell 407 GX helicopters, spare parts, flight suits, and logistical as well as training support for this equipment.

11.     On information and belief, Richard Solberg ("Solberg") of Cavalcade Services, LLC ("Cavalcade"), and Kilani were notified of Iraq's need for helicopters as a result of past dealings with Iraq's Ministry of Defense.

12.     On information and belief, Cavalcade and Manhattan had done in excess of $50 million in business together.  Manhattan paid Cavalcade commissions for locating vendors who could fulfill the various underlying requests for equipment.

13.     On information and belief, Solberg and Kilani traveled to Iraq to meet with senior contacts within Iraq's government in July 2014.  As a result of these meetings, Iraq retained Manhattan to arrange for its procurement of the helicopters, parts, and logistical support.

14.     Major General Noori Al-Maliki, the General Commander of the Iraqi Armed Forces, published a letter on July 11, 2014, to "finalize the contract process with Manhattan." Iraq requested: (a) sixteen Bell 407 GX helicopters; (b) five years of spare parts; (c) five years of contract logistical support; and (d) one year of training ground support.

15.     On July 21, 2014, Iraq formally contracted with Manhattan to arrange for its procurement of sixteen Bell 407 GX helicopters, three sets of spare parts, 120 flight suits, 120 flight helmets, and 30 radio systems.

**B.      Manhattan and its corporate officers fraudulently induced BBM into providing Manhattan with sixteen Bell helicopters.**

16.     To arrange for Iraq's procurement of the helicopters, Manhattan and Cavalcade contacted Frederick Hees ("Hees"), the President of BBM.

17.     Solberg met Hees at a trade show for the defense and aerospace industry in January 2014.  Cavalcade was initially interested in doing business with BBM because it has an exclusive appointment to sell Denel munitions.  Cavalcade had discussed selling Denel munitions to Iraq, but this deal never came to fruition.

18.     Following Cavalcade's inquiry, BBM conducted due diligence on Manhattan and its corporate officers.  It confirmed that Kilani is the owner and President of Manhattan and came to learn that Anas Kilani is Manhattan's Assistant Chief Executive Officer and Yosef Ben Tov is its Business Development Manager.

19.     After conducting due diligence on Manhattan and its corporate officers, BBM agreed to meet with them in Washington, DC, in order to further discuss a potential deal and, in particular, to discuss BBM's reservations about how Manhattan would guarantee payment.

20.     For three days in August 2014, Manhattan's corporate officers – Kilani, Anas Kilani, and Ben Tov – met with BBM in Washington, DC, to negotiate the terms of a purchase contract for the sixteen helicopters, related equipment, and logistical support.

21.     In addition to Solberg, Kilani, and Ben Tov, representatives from BBM, Bell, Denel, and several diplomats from South Africa were present for the negotiations.

22.     At the conclusion of negotiations on August 4, 2014, BBM and Manhattan formally executed the purchase contract in Washington, DC.  When the parties departed from Washington, there were no terms left unresolved.

23.     The contract was for sixteen Bell 407 GX helicopters, three sets of spare parts, 120 sage green flight suits, 120 Gentex flight helmets, and 30 Wulfsberg radio systems.

24.     Among other things, the purchase contract between BBM and Manhattan specifies the payment terms, delivery, packaging specifications, import/export permits, trade terms, warranties, insurance, performance bonds, and release of funds.

25.     Under the terms of Manhattan's contract with BBM, it was obliged to pay: (a) $64 million before the helicopters were shipped; (b) $23,920,100 after Manhattan received 20% of its payment from Iraq; and (c) $9,768,900 after final inspection in Iraq following delivery.

6

26.     To assuage concerns about nonpayment, Manhattan and Kilani fraudulently represented that BBM could rely on the letter of credit issued by Iraq in favor of Manhattan to pay for the helicopters.  At the meeting, and in subsequent communications, Manhattan and Kilani represented that a separate letter of credit with BBM would add unnecessary costs and time delays to the project.

27.     On information and belief, Manhattan and Kilani knew at the time that they did not intend to fully compensate BBM in accordance with the terms negotiated during this meeting.

**C.     BBM performed its obligations under the contract – namely it supplied Iraq with sixteen Bell helicopters and related equipment.**

28.     Before the helicopters were delivered to Iraq, Ben Tov traveled to Bell's facilities in Piney Flats, Tennessee, and Fort Worth, Texas, to inspect the helicopters and spare parts.  Ben Tov did not object to the quality or condition of the helicopters, related equipment, or spare parts.

29.     After Ben Tov's inspections, BBM delivered the helicopters and related equipment to Iraq via four different shipments in January, February, April, and May of 2015 – as specified in the contract.

30.     Hees and other BBM contractors accompanied the first shipment of helicopters to verify that they were properly delivered to Iraq in a timely fashion.

31.     On January 27, 2015 – the date of the first delivery – several airplanes destined for Baghdad International Airport were attacked by small-arms ground fire, one of them (Fly Dubai) sustaining damage.  Despite considerable risk to their own safety, Hees and BBM insisted that the delivery would go forward, as scheduled.

32.     The helicopters and related equipment were shipped in accordance with the load plans in the August 2014 purchase contract between BBM and Manhattan.

33.     Upon arrival in Iraq, technicians inspected the helicopters and senior officials thereafter signed Acceptance and Delivery Inspection Certifications affirmatively representing that "the listed item has been inspected by the Third Party Inspection Agent and found to be in compliance with the provisions set forth in the referenced contract."

34.     Neither Manhattan nor Kilani were present in Iraq at the time of delivery.

35.     On April 8, 2015, two senior officials from Iraq signed a Property Transfer Receipt to confirm that Iraq had received all of the equipment to which it was entitled.

36.     One year later, on April 5, 2016, the Iraqi Defense Attaché to Iraq's Embassy in Washington, DC, represented in writing to a firm retained by BBM to assist in the collection of the moneys owed to it that its contract "was implemented 100% for the Iraqi Army Aviation."

**D.      After the helicopters were delivered, Manhattan's corporate officers withheld payments to BBM unless it complied with unreasonable demands for additional parts and support.**

37.     Rather than comply with the schedule of payments agreed to by the parties, Manhattan and Kilani repeatedly withheld funds and demanded concessions from BBM.

38.     Manhattan demanded, among other things, additional rotor blades, seats, hat-bin racks, and replacement batteries.  None of this equipment was part of the August 2014 purchase contract.

39.     Manhattan's demands for additional parts were extraordinary because many of these items are not readily commercially available.

40.     Due to Manhattan's demands, BBM incurred hundreds of thousands of dollars in additional expenses.

41.     At the time of these demands, BBM had personnel in Baghdad waiting to train the Iraqi pilots.

42.     Kilani and Manhattan refused to allow the training to occur unless BBM provided the requested additional parts, effectively stranding BBM's personnel.

43.     On information and belief, Manhattan and its corporate officers knowingly and intentionally exerted pressure on BBM to concede to their demand for additional goods and services by taking advantage of the fact that BBM's personnel were in Iraq.

44.     Although the parties had originally negotiated that the training would occur in the United States and/or near Baghdad where security would be unrequired or relatively inexpensive, Manhattan and its corporate officers moved the location of the training to Al-Kut Air Base in Central Iraq, posing a much greater risk of harm to the BBM training personnel.

45.     As a result of this fraudulent conduct, and the increased risk of harm to BBM's personnel, BBM paid hundreds of thousands of dollars to ensure the security of its personnel during the training.

**E.      Manhattan breached the parties' agreement by refusing to fully compensate BBM in accordance with the unequivocal terms of the purchase contract.**

46.     To compensate Manhattan for successfully locating and arranging the deal, Iraq issued a Letter of Credit from the Trade Bank of Iraq in favor of Jordan Kuwait Bank and Manhattan.

47.     On information and belief, the Letter of Credit between Manhattan and Iraq allowed Manhattan to draw down funds only for its intended purpose, which is a standard commercial term for this type of letter of credit.

48.     On information and belief, Manhattan and its corporate officers have nevertheless improperly drawn down funds on the letter of credit for reasons other than its intended purpose.

49.     Under the terms of Manhattan's contract with BBM, it was obliged to pay $64 million before the helicopters were shipped, (b) $23.9 million after Manhattan received 20% of its payment from Iraq, and $9.7 million after final inspection in Iraq following delivery.

50.     In three wire transfers in January and February of 2015, Manhattan wired BBM approximately $89.2 million.  Of the total $97.6 million owed pursuant to the contract, Manhattan has not paid $8,389,000.

51.     Manhattan made the wire transfers through its correspondent bank account at Bank of America in New York.

52.     As of the filing of this complaint, Manhattan still owes BBM $8,389,000 under the express terms of the contract.  This total is strictly the principal of Manhattan's contractual debt – exclusive of any interest or other remedies to which BBM may be entitled at law.

53.     Despite being notified of the outstanding debt and the inevitability of this lawsuit if they continued to refuse to pay, Manhattan and its corporate officers have ceased communicating with BBM about its demands.

## COUNT I
## (Breach of Contract)

54.     BBM re-alleges and incorporates each and every allegation contained in paragraph 1 through 53 above, as if fully herein alleged.

55.     In the District of Columbia, breach of contract entails: (a) the existence of a contract, (b) performance by the plaintiff of its obligations under the contract or some valid excuse as to non-performance, and (c) the defendant fails to fully perform one or more of its duties owed under the contract.

56.     On August 4, 2014, BBM and Manhattan entered into a contract to govern the purchase of civilian Bell 407 GX helicopters and related equipment.

57.     As part of this contract, Manhattan agreed to pay $97,689,000 for the helicopters and related equipment with funds garnered from a Letter of Credit between Iraq and Manhattan.

58.     The Letter of Credit was formally issued by the Trade Bank of Iraq in favor of Jordan Kuwait Bank and Manhattan.

59.     BBM performed its obligations under the contract by delivering the requested helicopters and equipment in the condition specified by the contract and otherwise abiding by the terms of the contract.

60.     Manhattan has nevertheless breached the contract by refusing to pay BBM $8,389,000 owed under the contract.

61.     As a result of Manhattan's breach of the contract, BBM was directly injured by Manhattan's nonpayment.

62.     In addition to its direct monetary injury of almost $9 million, BBM has suffered consequential damages, including loss of business reputation and loss of business opportunity.

63.     On information and belief, through harmful statements, Manhattan and Kilani have created a negative impression about BBM within the defense community, resulting in reputational harm and the loss of prospective business.

## COUNT II
## (Unjust Enrichment)

64.     BBM re-alleges and incorporates each and every allegation contained in paragraphs 1 through 63 above, as if fully herein alleged.

65.     In the District of Columbia, the elements of unjust enrichment are: (a) the defendant was enriched at the expense of the plaintiff; and (b) circumstances are such that, in good conscience, the defendant should make restitution.

66.     BBM invested substantial time, capital, and expertise into obtaining and delivering the goods and services requested by Manhattan and Kilani.

67.     On information and belief, Manhattan and Kilani have drawn down funds on the letter of credit – some of which are due to BBM for its performance under the contract.  After being compensated by Iraq for the goods and services provided by BBM, Manhattan and Kilani refused to remit full payment to BBM.

68.     Manhattan and Kilani were directly enriched by at least $8,389,000 by refusing to pay BBM the full amount owed for the helicopters.

69.     Good conscience demands that Manhattan and Kilani make restitution to BBM for their unjust conduct.

## COUNT III
### (Fraud)

70.     BBM re-alleges and incorporates each and every allegation contained in paragraphs 1 through 69 above, as if fully herein alleged.

71.     In the District of Columbia, fraud entails: (a) a false representation, (b) concerning a material fact, (c) made with knowledge of its falsity, (d) with intent to deceive, and (e) upon which reasonable reliance is placed.

72.     Manhattan and Kilani falsely represented that BBM could rely on Manhattan's letter of credit with Iraq to guarantee full payment for the helicopters.

73.     If not for Manhattan and Kilani's representations, BBM would not have provided Manhattan with the Bell 407 GX helicopters and equipment.  One of the main reasons that the parties met in Washington, DC, in August 2014 was for Kilani to warrant how Manhattan would guarantee payment.

74.     On information and belief, Kilani knew that Manhattan did not intend to fully compensate BBM for the helicopters and equipment.

75.     On information and belief, Manhattan and Kilani intended to deceive BBM in order to avail themselves of BBM's technology and equipment without paying full market value.

76.     On information and belief, Manhattan and Kilani drew against the letter of credit provided by Iraq for reasons other than its "intended purpose."

77.     BBM reasonably relied on Manhattan and Kilani's representations by providing Manhattan with Bell 407 GX helicopters and equipment.

78.     As a result of Kilani and Manhattan's refusal to pay BBM, BBM was deprived of its lawful right to $8,389,000 plus interest.

79.     BBM was also deprived of in excess of $1 million due to fraudulent demands for additional parts and services by Manhattan's corporate officers.  As explained in detail above, Manhattan's corporate officers extracted concessions from BBM by withholding payments lawfully owed under the parties' agreement.

## PRAYER FOR RELIEF

WHEREFORE, BBM demands the following:

- Damages in amount to be proven at trial but far in excess of $75,000, compensating BBM for its loss from Manhattan's breach of contract and fraud.

- Consequential damages, special damages, or other damages that result as a consequence of Manhattan's non-performance.

- Injunctive relief, including but not limited to an injunction requiring Manhattan to pay all amounts owed under its contract with BBM.

- Pre-judgment and post-judgment interest at the maximum rate permitted under the law.

- Costs, litigation expenses, and attorneys' fees as are available under applicable law.

- Such other and further relief as the Court deems proper and just.

Dated:  April 19, 2016                          Respectfully submitted,


                                                /s/ Paul W. Butler
                                                Paul W. Butler (DC Bar # 493942)
                                                David M. Coleman (DC Bar # 1025446)
                                                AKIN GUMP STRAUSS HAUER & FELD, LLP
                                                1333 New Hampshire Avenue N.W.
                                                Washington, DC  20036
                                                (202) 887-4000 (phone)
                                                (202) 887-4288 (facsimile)
                                                pbutler@akingump.com

                                                *Counsel for Plaintiff*